UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
SECURITIES AND EXCHANGE COMMISSION, )
)
　　　　　Plaintiff, )
)
　　v. )　　　Case No. 21-CV-11938 (DPW)
)
AMAR BAHADOORSINGH, )
)
　　　　　Defendant. )
_____)

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT
<u>AMAR BAHADOORSINGH</u>**

David J. D'Addio

Attorney for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
33 Arch Street, 24th Floor
Boston, MA 02110
Telephone: (617) 573-8900
Email: daddiod@sec.gov

**TABLE OF CONTENTS**

SUMMARY ..............................................................................................................................1

PROCEDURAL HISTORY ...................................................................................................1

ARGUMENT .........................................................................................................................2

   I.     The Factual Basis of the Commission's Claims Is Established as a Matter of Law. ............2

      A.    Legal Standard.............................................................................................................2

      B.    Bahadoorsingh Engaged in a Deceptive Scheme With His Co-Defendant and Others to Sell Momentous' Stock ...............................................................................2

      C.    Bahadoorsingh Engaged in Various Forms of Deceptive Conduct With Respect to Uneeqo Securities...........................................................................................................5

   II.    Bahadoorsingh Engaged in Numerous Securities Law Violations.......................................7

      A.    Claims 1 and 2:  Scheme Liability Under the Anti-Fraud Provisions of the Securities Act and the Exchange Act................................................................................7

      B.    Claims 3 and 4:  Misrepresentation Liability Under the Anti-Fraud Provisions of the Securities Act and Exchange Act. ....................................................................10

      C.    Claim 5:  Sale of Unregistered Stock ........................................................................11

   III.   The Court Should Enter the Proposed Final Judgment Against Bahadoorsingh.................12

      A.    Bahadoorsingh Should Be Permanently Enjoined from Future Misconduct. .................13

      B.    A Penny Stock Bar Should be Imposed on Bahadoorsingh. ...........................................14

      C.    Bahadoorsingh Should Be Enjoined Against Offering and Selling Certain Securities....15

      D.    Bahadoorsingh Should Be Ordered to Pay Disgorgement and Prejudgment Interest......16

      E.    Bahadoorsingh Should Be Ordered to Pay a Third-Tier Civil Penalty ...........................18

CONCLUSION ......................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680, 695-97 (1980)..............................................................8, 10

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) ........................................8

*Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).....................................................10

*Graham v. SEC*, 222 F.3d 994, 1001-02 (D.C. Cir. 2000)................................................8

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983)................................8

*Jaffee & Co. v. SEC*, 446 F.2d 387, 392 (2d Cir. 1971)..................................................10

*Janus Capital Group v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ...........10, 11

*Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020)......................................................................16

*Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019) ................................................................8

*SEC v. Alternative Green Techs., Inc.*, No. 11 Civ. 9056, 2012 WL 47630944, at *5 (S.D.N.Y. Sept. 24, 2012).........................................................................................................................9

*SEC v. Altomare*, 300 Fed. App'x. 70 (2d Cir. 2008) ....................................................12

*SEC v. Bio Defense Corp.*, No. 12-11669-DPW, 2019 WL 7578525, *13 (D. Mass. Sept. 6, 2019)11

*SEC v. BioChemics*, C.A. No. 12-12324-MLW (D. Mass.)..............................................16

*SEC v. Carrillo et al.*, No. 21-CV-11272-WGY (D. Mass. filed Aug. 4, 2021)...............12

*SEC v. Constantin*, 939 F. Supp. 2d 288, 305 (S.D.N.Y. 2013) ....................................10

*SEC v. Druffner*, 517 F. Supp. 2d 502, 512 (D. Mass. 2007)........................................18

*SEC v. Eagle Eye Asset Mgmt.*, 975 F. Supp. 3d 151, 162-63 (D. Mass 2013) ...............20

*SEC v. Esposito*, 260 F. Supp. 3d 79, 91 (D. Mass. 2017)........................................7, 11

*SEC v. Fiore*, 416 F. Supp. 3d 306, 323 (S.D.N.Y. 2019)...............................................9

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) ..............................18

*SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) .............................................................17

*SEC v. Jones*, 300 F. Supp. 3d 312, 315-16 (D. Mass. 2018) .......................................11

*SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *18 (S.D.N.Y. Dec. 6, 2013)......16

*SEC v. Morrone,* 997 F.3d 52, 62 (1st Cir. 2021)..........................................................11

*SEC v. Navellier & Assocs, Inc.,* No. 17-cv-11633, 2021 WL 5072975, *1-2 (D. Mass. Sept. 19, 2021)..................................................................................................................17, 18

*SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)..............................................................14

*SEC v. Sargent*, No. 19-cv-11416-WGY, 2022 WL 686452, *10-11 (D. Mass. Mar. 8, 2022) . 12, 13, 18

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 862–63 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998)...............................................................................................................................9

*SEC v. Spencer Pharmaceuticals*, 2015 WL 5749436, at *8 (D. Mass. Sep. 30, 2015)...................14

*SEC v. Tropikgadget FZE, et al.,* No. 15-10543, 2016 WL 4555595, *2 (D. Mass. Aug. 31, 2016).2, 16

*SEC v. Universal Express, Inc.,* 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) ...................12

*SEC v. Verdiramo*, No. 10-cv-1888, 2013 WL 57823, *3 (S.D.N.Y. Jan. 7, 2013) .........................20

*SEC v. Wall et al.*, No. 11-cv-00139-JHR (D. Me. March 31, 2020) ...............................15

*SEC v. Weed*, No. 18-1654, slip op. at 2 (1st Cir. May 14, 2019) ...............................8, 14

*United States v. Naftalin*, 441 U.S. 768, 773-76 .............................................................8

**Statutes**

15 U.S.C. § 78c(a)(47) ...................................................................................................15

15 U.S.C. § 78u(d)(5)......................................................................................................15

15 U.S.C. §§77e(a), (c) ..................................................................................................11

15 U.S.C. §§77t(g)(1)...........................................................................................14
15 U.S.C. §§77t(g)(2)...........................................................................................14
15 U.S.C. §77q(a)(2)............................................................................................10
15 U.S.C. §77t(b), §78u(d)(2)...............................................................................13
15 U.S.C. §77t(d)(1)............................................................................................18
15 U.S.C. §77t(d)(2)............................................................................................19
15 U.S.C. §78c(a)(51)..........................................................................................14
15 U.S.C. §78j(b).............................................................................................7, 10
15 U.S.C. §78u(d)(3)(A).......................................................................................18
15 U.S.C. §78u(d)(3)(B).......................................................................................19
15 U.S.C. §78u(d)(6)(B........................................................................................14
15 U.S.C. §78u(d)(7)............................................................................................16
17 C.F.R. §201.1001(b)........................................................................................19
17 C.F.R. §201.600(b)..........................................................................................18
17 C.F.R. §240.10b-5(a), (c)...................................................................................7
17 C.F.R. §240.10b-5(b).......................................................................................10
Exchange Act Rule 10b-5(b).................................................................................10
Exchange Act Rule Rule 10b-5..........................................................................1, 12
Exchange Act Section 10(b)...................................................................1, 7, 10, 12
Exchange Act Section 21(d)(1).............................................................................13
Exchange Act Section 21(d)(6).............................................................................14
Exchange Act Sections 13(d)................................................................................12
Securities Act of 1933 ("Securities Act") Section 5...........................................1, 11
Securities Act Section 17(a)..............................................................................7, 12
Securities Act Section 17(a)(1), (2), and (3)............................................................1
Securities Act Section 17(a)(2)............................................................................10
Securities Act Section 20(b).................................................................................13
Securities Act Section 20(g)(1)............................................................................14
Securities Act Sections 17(a)(1), and (3)................................................................8

**Rules**

Rules 10b-5(a) and (c)........................................................................................7, 8
Exchange Act Rule 10b-5(b).................................................................................11
Exchange Act Rule Rule 10b-5..........................................................................1, 12
Exchange Act Section 10(b)...................................................................1, 7, 11, 12
Exchange Act Section 21(d)(1).............................................................................13
Exchange Act Section 21(d)(6).............................................................................14
Exchange Act Sections 13(d)................................................................................12
Securities Act of 1933 ("Securities Act") Section 5...........................................1, 11
Securities Act Section 17(a)..............................................................................8, 12
Securities Act Section 17(a)(1), (2), and (3)............................................................1
Securities Act Section 17(a)(2)............................................................................10
Securities Act Section 20(b).................................................................................13
Securities Act Section 20(g)(1)............................................................................14
Securities Act Sections 17(a)(1), and (3)................................................................8

**SUMMARY**

Amar Bahadoorsingh ("Bahadoorsingh") engaged in fraudulent schemes with his co-defendant Vincenzo Carnovale and others to sell publicly-traded stock to investors.  They generated substantial illicit profits while defrauding investors and market intermediaries in several related ways.  First, Bahadoorsingh and Carnovale concealed the fact that they controlled the securities of Momentous Holdings Corp. ("Momentous") and Uneeqo, Inc. ("Uneeqo").  Second, they misled brokers, transfer agents, and/or investors about the provenance of these securities and their beneficial ownership of them, in order to convince these parties that the shares were eligible for trading in public markets.  Finally, they hired stock promoters to generate demand for their shares, and sold those shares to unwitting retail investors during the promotions that they orchestrated.

Through these actions, Bahadoorsingh violated Sections 5 (a) and (c), and 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a), (b), and (c) thereunder.

**PROCEDURAL HISTORY**

The Commission filed this case on December 2, 2021.  *See* Dkt No. 1.  Bahadoorsingh was validly served by email on December 14, 2021, by agreement of counsel.  *See* Dkt No. 5.

From December 2021 through July 2022, Bahadoorsingh engaged in settlement discussions with the Commission's counsel through his retained counsel, but those discussions did not produce a resolution.  July 18, 2022, the Commission moved to default Bahadoorsingh because he had failed to answer the complaint, and his counsel indicated that he did not plan to do so.  *See* Dkt No. 12. The Court entered the requested default on July 18, 2022.  *See* Dkt No. 13.  The Commission now asks the Court to enter a default judgment.

1

## ARGUMENT

**I.      The Factual Basis of the Commission's Claims Is Established as a Matter of Law.**

**A.  Legal Standard**

The entry of default is an admission by a defendant of the well-pleaded allegations in the complaint. *See SEC v. Tropikgadget FZE, et al.,* No. 15-10543, 2016 WL 4555595, *2 (D. Mass. Aug. 31, 2016).  The court may examine whether the complaint, "taking all well-pleaded factual allegations as true," states a cause of action. *Id.*  As detailed below, taking the well-pleaded facts alleged in the Complaint as true, the Commission is entitled to a default judgment here.

**B.  Bahadoorsingh Engaged in a Deceptive Scheme With His Co-Defendant and Others to Sell Momentous' Stock.**

Momentous was incorporated in Nevada in May 2015. *See* Compl. ¶26.  In April 2016, approximately 30 U.K. nationals purported to purchase 1,285,000 shares of Momentous for a total of $51,400 in a registered offering. *See id.* ¶¶27-28.  These 30 U.K. shareholders are referred to as the "Momentous S-1 Shareholders." *Id.*  On September 26, 2018, Momentous approved a stock dividend that operated as a 7-for-1 stock split, which increased the total number of shares held by the S-1 Shareholders from 1,285,000 to 8,995,000.[1] *See id.* ¶29.

At some point before August 2016, Carnovale amassed control over all of the shares issued to the Momentous S-1 Shareholders, which amounted to approximately 34% of the total number of Momentous shares outstanding and 100% of the Momentous shares issued without a restrictive legend. *Id.* ¶30.  The absence of restrictive legends on the stock certificates indicates that the shares are not restricted, but are instead immediately and freely tradeable.[2] *Id.* ¶28.

---

[1]  For clarity, all subsequent references to Momentous shares reflect post-split totals.

[2]  Whether subsequent sales require registration with the Commission is determined on a transaction-by-transaction basis, regardless of whether shares were at some previous time deemed "unrestricted." *See* Compl. ¶28; Section II.B *infra*.

Carnovale held the stock in overseas entities that were in the business of helping their clients disguise control and ownership of penny stocks. *Id.* ¶31. These entities have been separately charged by the Commission. *Id.* Starting in early 2017, Carnovale and Bahadoorsingh began transferring large tranches of Momentous shares to nominee entities that they controlled, including Travel Data Solutions LLC ("Travel Data Solutions"), a Wyoming company, and Success Zone Technology Limited ("Success Zone"), a Hong Kong company. *Id.* ¶32.

**Fraudulent Representations to Broker**

To effectuate some of these transfers and ultimately the sale of these securities, Bahadoorsingh and an associate ("Person 1") fabricated bank statements purporting to show that Bahadoorsingh's and Carnovale's nominees had paid the Momentous S-1 Shareholders to acquire their shares. No such payments were ever made. *Id.* ¶¶33, 33.a-b. Bahadoorsingh provided these fabricated documents to Success Zone's brokerage firm in order to obscure the provenance of these shares as well as Carnovale's and Bahadoorsingh's control over them. *Id.* ¶34. This deception caused the broker to conclude (incorrectly) that the Momentous shares should be made immediately available for trading and not otherwise subject to registration, holding, and disclosure requirements, or limitations on affiliate sales. *Id.* ¶34. Bahadoorsingh also made false and misleading statements to the broker regarding the bank account into which proceeds from Momentous stock sales were to be transferred. *Id.* ¶¶36-37. These false and misleading statements were designed to circumvent the broker's anti-money-laundering policies and procedures. *Id.* ¶36-38. As a result of this deception, Bahadoorsingh was able to collect and distribute roughly $500,000 in proceeds from the sale of Momentous shares through Success Zone. *Id.* ¶38.

**Fraudulent Representations to Firm that Obtained and Sold Momentous Shares**

Bahadoorsingh and Person 1 also provided false and misleading information, including fabricated documents, to an entity that held itself out as a venture capital and private equity firm

("Firm A") in connection with the sale of Momentous stock to Firm A. *Id.* ¶39. Through nominee company Travel Data Solutions, Bahadoorsingh sold approximately 1.5 million shares of purportedly unrestricted Momentous stock to Firm A in early 2020. *Id.* ¶¶39-43.

Among the false and fabricated documents Bahadoorsingh provided to Firm A were:

(1) a letter in which Bahadoorsingh falsely attested that Travel Data Solutions had purchased its shares directly from several Momentous S-1 shareholders in 2017 and 2018. *Id.* ¶41.

(2) Fabricated bank records purporting to show payments from the Travel Data Solutions bank account to several Momentous S-1 Shareholders. The genuine bank records show no payments to any Momentous S-1 Shareholders for their shares. *Id.* ¶41.

(3) Fabricated identification and proof of address documents for the Momentous S-1 shareholders that were specifically requested by Firm A's broker as part of that broker's due diligence. *Id.* ¶42-43.

Bahadoorsingh knew, or was reckless in not knowing, that Firm A would provide this false and misleading information to its broker in order to deposit and eventually sell Momentous shares to the investing public. *Id.* ¶39. Indeed, Firm A's broker, relying on the above-described documents, accepted Firm A's 1.5 million Momentous shares for deposit, making them immediately available for sale to the investing public. *Id.* ¶43. Firm A ultimately sold at least 300,000 of these shares to investors in the marketplace. *Id.* ¶43.

**<u>Deceptive Scheme to Promote and Sell Momentous Stock to Investing Public</u>**

In the spring of 2020, Bahadoorsingh and Carnovale hired stock promoters to tout Momentous stock to the public. *Id.* ¶44. The messages aggressively touted Momentous to potential investors, including senior citizens, but failed to disclose that Bahadoorsingh and Carnovale paid for the stock promotion and that they were the beneficial owners of significant quantities of Momentous stock that they were selling during the promotion. *Id.* ¶45.

Bahadoorsingh's and Carnovale's efforts to promote Momentous stock led to a significant increase in the stock's price and trading volume in April 2020, and sustained high trading volume in

June 2020.  *Id.* ¶46 (price and volume chart for Momentous stock).  During March and April 2020 alone, Bahadoorsingh and Carnovale, through nominee Success Zone, sold approximately 476,601 shares of Momentous, netting approximately $279,000.  *Id.* ¶47.  Bahadoorsingh deposited approximately $142,000 of the proceeds into his personal bank account, and transferred approximately $50,000 of those proceeds to Carnovale.  *Id.*

Around the start of the promotion, Carnovale and Bahadoorsingh were the beneficial owners of approximately 23% of the total outstanding shares of Momentous; approximately 77% of the Momentous shares issued without restrictive legends; and approximately 52% of the float (i.e., shares deposited and available for trading).  *Id.* ¶49.  As noted, the stock promotors did not disclose their ownership stake or their funding of the promotion.  *Id.*[3]  Investors were therefore unaware that the majority of shares available for trading belonged to Bahadoorsingh and Carnovale, who were working together to generate demand for the stock and increase the stock price.  *Id.* ¶49.

### C. Bahadoorsingh Engaged in Various Forms of Deceptive Conduct With Respect to Uneeqo Securities.

Because Bahadoorsingh's misconduct in connection with Momentous supports all of the relief the Commission seeks, the Commission only briefly summarizes Bahadoorsingh's conduct with respect to another publicly-traded penny stock, Uneeqo.  As was the case with Momentous, Carnovale initially acquired a large block of shares, purportedly from shareholders who registered their shares for sale with the Commission.  Compl. ¶¶54-56.  Specifically, between 2014 and 2016, Carnovale acquired at least 23 million of the 50 million shares purportedly owned by these "Uneeqo S-1 Shareholders."  *Id.* ¶56.[4]

---

[3] Moreover, Momentous' annual report (Form 10-K) for fiscal year 2019 did not disclose the fact that Carnovale and Bahadoorsingh beneficially owned more than 5% of Momentous' common stock, as Defendants had hidden their ownership interests through the use of overseas asset managers and nominee entities.  *See* Compl. ¶49.

[4] In 2013, Uneeqo effected a 10-for-1 share split; for clarity all references are to post-split totals.  *See* Compl. ¶55.

As described in the Complaint, Carnovale hid his ownership stake through, among other means, overseas asset managers and nominee entities. *Id.* ¶¶57-60. In the summer of 2016, Carnovale hired a stock promoter to tout Uneeqo stock to the public while he used his nominee entities to dump a portion of his Uneeqo shares into the market. *Id.* ¶¶61-63. During this promotional campaign, Carnovale sold approximately 1.7 million Uneeqo shares (net) for approximately $509,000. *Id.* ¶63.

Beginning in late 2018, Bahadoorsingh became involved in a series of fraudulent and deceptive acts involving Uneeqo, as he exerted his undisclosed control over various aspects of the management of the company. *Id.* ¶¶70-77.

### Fraudulent Representations Regarding Uneeqo Convertible Debt

On February 15, 2019, Bahadoorsingh sold to Firm A a $65,000 convertible note that Uneeqo had purportedly issued to Bahadoorsingh's nominee company, Travel Data Solutions. *Id.* ¶70. A "convertible note" is a promissory note issued by a company that entitles the lender to convert the company's debt into equity in the company. *Id.* ¶24. Travel Data Solutions falsely claimed to have paid Uneeqo $65,000 in 2016 for the note. *Id.* ¶70. To support this false claim, Bahadoorsingh sent Firm A a $65,000 wire transfer record that he fabricated. *Id.* No such payment was ever made. *Id.*

Between February 2019 and June 2020, Firm A converted portions of the $65,000 note more than a dozen times, ultimately causing Uneeqo to issue more than 490 million shares to Firm A without restrictive legends. *Id.* ¶70. Every time that Firm A converted a portion of the $65,000 note, Firm A provided to Uneeqo's transfer agent various supporting documents, including the note and the wire remittance record that Bahadoorsingh fabricated. *Id.* ¶71.[5]

---

[5] A "transfer agent" is a company that, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks. Transfer agents routinely keep track of whether shares are restricted from resale. *See* Compl. ¶20. ¶

**False and Misleading Representations in Uneeqo Public Filings**

Throughout 2019 and 2020, Bahadoorsingh, Carnovale, and an associate exercised control over various aspects of the management of Uneeqo, including, among other things, by using Uneeqo's corporate email account, updating Uneeqo's website, preparing corporate documents, and submitting company reports to the OTC Market Group's public website.  *Id.* ¶¶73-74.

One of the financial statements Bahadoorsingh directed Person 1 to upload to OTC Markets on behalf of Uneeqo contained material misstatements regarding the September 2016 convertible debt (described above) that Travel Data Solutions purportedly held.  *Id.* ¶75.  Specifically, the financial statements he submitted contained false information regarding the note and further failed to disclose that:  (1) Travel Data Solutions had sold its note to Firm A, and (2) that Firm A had renegotiated the terms of the note for a much lower conversion rate.  *Id.* ¶¶75-76.  Bahadoorsingh's misstatements and omissions regarding the convertible note deprived investors of material information regarding the risk of dilution of their Uneeqo shares.  *Id.* ¶¶75-77.  The Commission suspended trading of Uneeqo shares on October 22, 2020.  *Id.* ¶79.

**II.     Bahadoorsingh Engaged in Numerous Securities Law Violations.**

**A.  Claims 1 and 2:  Scheme Liability Under the Anti-Fraud Provisions of the Securities Act and the Exchange Act.**

Exchange Act Section 10(b) and Rules 10b-5(a) and (c) prohibit using any means of interstate commerce or the mails to directly or indirectly:  employ any device, scheme or artifice to defraud; or engage in any act, practice, or course of business that operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security.  *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(a), (c).  Scheme liability under Rule 10b-5(a) and (c) arises where defendants "employ a deceptive device for the purpose of defrauding" others.  *SEC v. Esposito*, 260 F. Supp. 3d 79, 91 (D. Mass. 2017).  Securities Act Section 17(a) contains similar prohibitions to Exchange Act Section 10(b), though the conduct must be in the offer or sale of any security.  *See* 15 U.S.C. §77q(a)(1),

(3).  The language of these provisions is "expansive," and they "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).

To establish violations of Section 10(b) and Section 17(a)(1), the Commission must show that Bahadoorsingh acted with scienter, but negligence is sufficient to establish liability under Sections 17(a)(3).  *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (scienter may be established by a showing of recklessness). "[P]roof of scienter required in fraud cases is often a matter of inference from circumstantial evidence."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

The well-pleaded allegations of the Complaint demonstrate that Bahadoorsingh engaged in a scheme to defraud in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and Sections 17(a)(1), and (3) of the Securities Act.

At the center of the scheme were the efforts of Bahadoorsingh and others to sell Momentous shares while hiding their control of the Company.  To effectuate the scheme, Bahadoorsingh provided a broker with numerous false statements and falsified documents.  These kinds of misrepresentations to market intermediaries such as brokers and transfer agents are actionable under the antifraud provisions of the securities laws.  *See generally United States v. Naftalin*, 441 U.S. 768, 773-76 (antifraud provision of Securities Act prohibits fraud against brokers as well as investors); *Graham v. SEC*, 222 F.3d 994, 1001-02 (D.C. Cir. 2000) (applying *Naftalin* to Exchange Act); *SEC v. Weed*, No. 18-1654, slip op. at 2 (1st Cir. May 14, 2019) ( "misrepresentations to an intermediary, such as a transfer agent" do not escape civil enforcement even if "the misrepresentations do not reach investors").  Bahadoorsingh drew from the same playbook when selling 1.5 million shares of Momentous stock to Firm A.  He provided Firm A with numerous false

and fabricated documents, knowing that they would be provided to market intermediaries such as

Firm A's broker and Momentous' transfer agent.[6]

These false statements were material because they related to, among other things, the

provenance of the shares and accordingly, whether the shares were restricted or instead available for

trading on public markets.  *See, e.g.*, *SEC v. Alternative Green Techs.*, *Inc.*, No. 11 Civ. 9056, 2012

WL 47630944, at *5 (S.D.N.Y. Sept. 24, 2012) (scheme liability for misrepresentations to transfer

agent via attorney opinion letter addressing whether shares could be issued on unrestricted basis).

In order to sell Momentous shares in bulk to the investing public, Bahadoorsingh and

Carnovale ran a stock promotion designed to drum up demand for Momentous shares.  But the

defendants did not disclose their control over Momentous, their funding of the promotion, or their

sales of Momentous shares during that promotion.  These omissions misled the unsuspecting retail

investors who purchased the shares Bahadoorsingh and Carnovale sold into the market.  *See SEC v.

Fiore*, 416 F. Supp. 3d 306, 323 (S.D.N.Y. 2019) ("[T]he fact that it is widely assumed that

promotional campaigns have been funded by *someone*, has not prevented courts from finding that

failing to disclose a beneficial interest in promoted stock and a present intent to sell is a material

omission under the securities laws.") (citation and internal quotation marks omitted).

Bahadoorsingh's brazen fabrication of documents containing false statements leaves no

doubt that Bahadoorsingh acted with scienter.  Finally, Bahadoorsingh's stock sales involved

interstate commerce, including the use of the facilities of the OTC Markets to sell Momentous

---

[6] Although the conduct alleged regarding Momentous is sufficient to support the relief sought herein, the Commission notes that with respect to Uneeqo, Bahadoorsingh engaged in similar deceptive conduct, fabricating documents that included false statements that he made in support of the sale of a convertible note to Firm A.  *See* Compl. ¶70-72. Bahadoorsingh further made materially false statements in one of Uneeqo's annual reports filed publicly on OTC Market Group's website.  *Id.* ¶75-77.  Public annual reports are "unquestionably the type of documents upon which an investor would have relied in deciding whether to purchase [a company's] stock, hence they satisfy the 'in connection with' requirement of Section 10(b) and Rule 10b-5."  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 862–63 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

shares, electronic communications with co-schemers, email communications with Success Zone's

broker, and wire transmission of the proceeds of Bahadoorsingh's sales to various bank accounts.

*See, e.g.*, Comp. ¶¶14, 21, 33, 36-38, 41-48; Donelan Declaration, filed herewith, ¶¶17-18.  *See*

*generally Jaffee & Co. v. SEC*, 446 F.2d 387, 392 (2d Cir. 1971) (bids over OTC "Pink Sheets"

satisfy interstate commerce requirement); *SEC v. Constantin*, 939 F. Supp. 2d 288, 305 (S.D.N.Y.

2013) (use of email and wire transfers in connection with the sale of securities is sufficient to bring

conduct within the jurisdictional scope of Exchange Act § 10(b) and Securities Act § 17(a)).

### B.  Claims 3 and 4:  Misrepresentation Liability Under the Anti-Fraud Provisions of the Securities Act and Exchange Act.

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder make it unlawful to make

materially false or misleading statements or omit to state a material fact necessary in order to make

the statements made not misleading in connection with the purchase or sale of securities.  *See* 15

U.S.C. §78j(b); 17 C.F.R. §240.10b-5(b).  Section 17(a)(2) of the Securities Act makes it unlawful

to obtain money or property by means of materially false or misleading statements or omissions in

the offer or sale of securities.  *See* 15 U.S.C. §77q(a)(2).  Negligence is sufficient to establish

liability.  *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980).

Misstatements and omissions are material if a substantial likelihood exists that a reasonable

investor would consider the information important in making an investment decision.  *See Basic*

*Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Under Rule 10b-5(b), the Commission must prove

that the defendant "is the person or entity with ultimate authority over the statement, including its

content and whether and how to communicate it."  *Janus Capital Group v. First Derivative Traders*,

564 U.S. 135, 142 (2011).

Because Bahadoorsingh made the above-described false statements in connection with the

sale of Momentous shares, they meet the requirements of both the Exchange Act Section 10(b) and

Rule 10b-5(b) thereunder.  They further meet the requirements of Section 17(a)(2) because

Bahadoorsingh obtained money from the sale of Momentous shares by means of those false statements.  As alleged in the Complaint, Bahadoorsingh maintained "ultimate authority" over the false statements, *Janus Capital Group*, 564 U.S. at 142, whether by authoring them himself (*e.g.*, Compl. ¶41) or by directing an associate to do so (Compl. ¶¶33-34, 36).  Bahadoorsingh's misrepresentations and omissions were material for the reasons described above.

### C.  Claim 5:  Sale of Unregistered Stock

Section 5 of the Securities Act prohibits direct or indirect offers and sales of securities through the mail or means of interstate commerce unless a registration statement has been filed (for an offer) and is in effect (for a sale).  15 U.S.C. §§77e(a), (c).  To establish a *prima facie* case for a violation of Section 5, the Commission must prove that:  (1) no registration statement was filed or in effect as to the security; (2) the defendant offered to sell or sold a security; and (3) the defendant used the mails or means of interstate transportation or communication to offer or sell the security. *See SEC v. Bio Defense Corp.*, No. 12-11669-DPW, 2019 WL 7578525, *13 (D. Mass. Sept. 6, 2019); *Esposito*, 260 F. Supp. 3d at 88.  Section 5 "imposes strict liability on sellers."  *See Bio Defense Corp.,* at *13; *Esposito*, 260 F. Supp. 3d at 88-89.

For the second element, when a defendant is not a direct seller or offeror of securities, an indirect seller or offeror may be liable if the defendant is a "necessary participant" or a "substantial factor" in the unregistered sale or offer.  *See SEC v. Morrone,* 997 F.3d 52, 62 (1st Cir. 2021) (affirming summary judgment ruling that defendant was "necessary participant" or "substantial factor" in scheme to sell unregistered securities when he failed to disclose relevant fees); *SEC v. Jones*, 300 F. Supp. 3d 312, 315-16 (D. Mass. 2018) (applying standard).

Each of these elements is met here, and Bahadoorsingh thus violated Section 5.  First, no registration statements were filed for the Momentous sales that Bahadoorsingh conducted.  *See* Comp. ¶51.  The requirement for a registration statement applies to each separate offer and sale of a

security, not to the security itself; thus proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security. *See SEC v. Sargent*, No. 19-cv-11416-WGY, 2022 WL 686452, *10-11 (D. Mass. Mar. 8, 2022); *SEC v. Universal Express, Inc.,* 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007), *aff'd sub nom, SEC v. Altomare*, 300 Fed. App'x. 70 (2d Cir. 2008); Compl. ¶19.  Second, Bahadoorsingh offered to sell—and did sell—Momentous securities Success Zone's brokerage account that he controlled. *See* Comp. ¶¶33-34, 47.  Third, Bahadoorsingh's stock sales involved interstate communications, including, as described above, the use of OTC Markets, electronic communications, and the wire transmission of the proceeds of Bahadoorsingh's sales.

### III.    The Court Should Enter the Proposed Final Judgment Against Bahadoorsingh.

The Commission seeks entry of several forms on injunctive relief, along with disgorgement and prejudgment interest, and a monetary penalty.  Some of the injunctive relief sought herein overlaps with relief previously sought and obtained against Bahadoorsingh in a separate Commission action, *SEC v. Carrillo et al.*, No. 21-CV-11272-WGY (D. Mass. filed Aug. 4, 2021) (*see* Donelan Dec., Ex. B (complaint) & Ex. C (default judgment)).  In that matter, Judge Young recently entered a default judgment against Bahadoorsingh for his conduct in a separate penny stock fraud that similarly involved a "pump and dump" scheme.  Specifically, Judge Young: (1) permanently enjoined Bahadoorsingh from violating of Sections 5 and 17(a) of the Securities Act; (2) permanently enjoined Bahadoorsingh from violating Sections 13(d) and 10(b) of the Exchange Act and Rule 10b-5 thereunder; and (3) imposed a permanent penny-stock bar.  Judge Young further ordered payment of $572,002 in disgorgement, $149,299 in prejudgment interest thereon, and a $207,183 penalty.

Here, the Commission asks this Court to impose, if deemed appropriate, a permanent injunction against future violations of Sections 5 and 17(a) of the Securities Act, and Section 10(b)

of the Exchange Act and Rule 10b-5 thereunder (but not Section 13(d) of the Exchange Act), and a permanent penny stock bar.  The Commission seeks an additional conduct-based injunction barring Bahadoorsingh from offering purchasing, or selling securities other than those listed on a national exchange for his personal account.  Finally, the Commission seeks disgorgement, prejudgment interest, and a monetary penalty.  As described below, the Court has the discretion to impose all of the relief sought herein, and the facts of this case warrant such relief.

### A.  Bahadoorsingh Should Be Permanently Enjoined from Future Misconduct.

Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act permit the Commission to seek permanent injunctions against further violations of the federal securities laws. 15 U.S.C. §77t(b), §78u(d)(2).  Courts will issue permanent injunctions if the defendant's conduct indicates a reasonable likelihood of further violations, based on the egregious or isolated nature of the conduct, the degree of scienter, and the extent to which the defendant recognizes the wrongfulness of his acts.  *See SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003).

Here, the need for a permanent injunction against Bahadoorsingh is compelling given the scope of his misconduct relating to Momentous and Uneeqo.  The misconduct occurred over a lengthy period of time and was very profitable, enabling Bahadoorsingh and his confederates to sell nearly a million Momentous shares to the public, generating nearly half a million dollars in proceeds.  Bahadoorsingh brazenly fabricated documents and made material false statements and omissions to investors and market intermediaries.  And he was preparing with Carnovale to perpetuate a similar scheme again with Uneeqo—consolidating outstanding Uneeqo shares and preparing to conduct another deceptive promotional campaign—before the SEC suspended trading. *See* Compl. ¶¶5, 77-79.  The high degree of scienter is evident from his willingness to create from whole cloth whatever documentation he needed to perpetuate his scheme.  Bahadoorsingh has expressed no remorse, and has retained significant proceeds from his misconduct that could

ultimately be used to repay victimized investors.  In addition, as described above, the Commission

sued Bahadoorsingh in a separate case for securities fraud involving other microcap securities

traded on OTC markets.  Thus a permanent injunction against future violation is warranted here, as

the likelihood of further violations is great.

**B.  A Penny Stock Bar Should be Imposed on Bahadoorsingh.**

Under Section 20(g)(1) of the Securities Act and Section 21(d)(6) of the Exchange Act,

courts have the equitable authority to bar any person from participating in future offerings of penny

stocks if that person was participating in the offering of a penny stock at the time of the misconduct.

*See* 15 U.S.C. §§77t(g)(1); 78u(d)(6); *SEC v. Weed*, 315 F. Supp. 3d 667, 671 (D. Mass. 2018); *SEC*

*v. Spencer Pharmaceuticals*, 2015 WL 5749436, at *8 (D. Mass. Sept. 30, 2015).  A "person

participating in an offering of penny stock" includes "any person engaging in activities with a

broker, dealer or issuer for purposes of issuing, trading, or inducing or attempting to induce the

purchase or sale of, any penny stock."  15 U.S.C. §§77t(g)(2); 78u(d)(6)(B).  A "penny stock" is

defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as equity securities

that do not meet certain exemptions—essentially, most stocks that do not trade on a national

securities exchange, that trade under $5 per share, and whose issuers do not meet certain thresholds

of tangible assets or revenue.  *See* 15 U.S.C. §78c(a)(51).  "The standard for imposing [a penny

stock] bar essentially mirrors that for imposing an officer-or-director bar."  *Weed,* 315 F. Supp. 3d.

at 677 (internal quotations omitted). The standard for imposing an officer-or-director bar includes

"(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender

status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree

of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that

misconduct will recur."  *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (internal quotations omitted).

At the time of the scheme described in the Complaint, Momentous and Uneeqo shares were

penny stocks within the Exchange Act's definition.  *See* Comp. ¶¶14, 23, 40-47, (Momentous); 15, 23, 55, 62 (Uneeqo).  Further, Bahadoorsingh was "participating in an offering of penny stock" through his illegal trading described in the Complaint because he used an entity he controlled to hold a penny stock and to trade it in concert with promotional activities that he and Carnovale paid for.  The factors summarized above—and Bahadoorsingh's failure to appear in this case or to pledge not to engage in this type of misconduct again—demonstrate that the Court should bar him from further participation in the offering of penny stocks.

### C.  Bahadoorsingh Should Be Enjoined Against Offering and Selling Certain Securities.

The Court has the authority to order a "conduct-based" injunction under Section 21(d)(5) of the Exchange Act:

> Equitable Relief.  In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

15 U.S.C. § 78u(d)(5)[7].  Consequently, the Court has the authority to enjoin the defendants from engaging in conduct such as participating in securities offerings or purchasing and selling securities through nominee entities.  Here, the Commission seeks an injunction that prohibits Bahadoorsingh from "directly or indirectly, including, but not limited to, through an entity owned or controlled by [him], participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent [Bahadoorsingh] from purchasing or selling securities listed on a national securities exchange for [his] own personal account[]."  Compl. Prayer for Relief, § F.  Similar injunctive language has been issued by district courts in the First Circuit and elsewhere.  *See, e.g.*, *SEC v. Wall et al.*, No. 11-cv-00139-JHR (D. Me. March 31, 2020) (Dkt. No. 18, ¶ IV

---

[7]  Exchange Act Section 21(d)(5) provides that such equitable relief is applicable to cases brought under any provision of the "securities laws," which includes the Securities Act.  *See* 15 U.S.C. § 78c(a)(47) (defining "securities laws" to include the Securities Act).  Thus, a court may order a conduct-based injunction based on violations of Sections 5 and 17(a) of the Securities Act.

("Defendants are permanently restrained and enjoined, directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendants, from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such an injunction shall not prevent Mr. Wall from purchasing or selling securities for his own personal accounts.); *SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *18 (S.D.N.Y. Dec. 6, 2013) ("[defendant] is hereby permanently enjoined from, directly or indirectly, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account")[8]

Here, Bahadoorsingh induced brokers to deposit securities and offered these securities to potential investors through a series of false statements, omissions, and other deceptive conduct. A conduct-based injunction that precludes him from participating in securities offerings and trading through other entities will mitigate the risk of future frauds using the types instruments (i.e., nominee entities trading via OTC markets), while still allowing Bahadoorsingh to invest in public companies listed on national exchanges in his own account. Given the extensive duration and scope of the misconduct in this case, such relief is appropriate.

### D. Bahadoorsingh Should Be Ordered to Pay Disgorgement and Prejudgment Interest.

Though long recognized as an available remedy in Commission enforcement actions, Section 21(d) of the Exchange Act now expressly authorizes the Commission to seek disgorgement for violations of the federal securities laws. *See* 15 U.S.C. §78u(d)(7). The Supreme Court also recently reaffirmed the Commission's authority to obtain disgorgement. *See Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). Disgorgement is a "profit-based measure of unjust enrichment" that is

---

[8] For other instances where the SEC has sought and received conduct-based injunctions in this District include: *SEC v. BioChemics*, C.A. No. 12-12324-MLW (D. Mass.) (final judgment entered 8/18/17, Dkt No. 345, ¶ II); *SEC v Tropikgadget FZE*, C.A. No. 15-cv-10543-ADB (D. Mass.) (final judgment entered 8/31/16, Dkt No. 261, ¶ IV).

measured by the defendant's "wrongful gain."  *Id.* at 1943 (internal quotations omitted).  The

amount of disgorgement "need only be a reasonable approximation of profits causally connected to

the violation," and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer

whose illegal conduct created that uncertainty."  *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC*

*v. Navellier & Assocs, Inc.,* No. 17-cv-11633, 2021 WL 5072975, *1-2 (D. Mass. Sept. 19, 2021)

(applying this standard after *Liu*).

 The Commission's disgorgement calculation for Bahadoorsingh focuses on the net profits he

wrongfully retained in accounts under his control from the illegal trading he conducted in

Momentous securities.  As explained in the Complaint, Success Zone, one of the entities

Bahadoorsingh controlled, generated about half a million dollars by selling Momentous shares

through its brokerage account.  *See* Compl. ¶38.  Proceeds of those sales were transferred in part to

third parties, in part to Carnovale, and in part for Bahadoorsingh's benefit.  *See id.* ¶47.  At a

minimum, Bahadoorsingh's personal benefit from this trading was $231,020, as shown in the chart

below that summarizes transfers of proceeds from Momentous sales Success Zone's brokerage

account, to the following recipients, either directly, or though intermediate accounts he had the

ability to access (*see* Compl. ¶¶ 38, 72).

| Payments in 2019 | Payments in 2020 | Recipient of Payment | Total Amount of Payments |
|---|---|---|---|
| $104,870 | $91,550 | Amar Bahadoorsingh personal bank account | $196,420 |
| $34,600 | | Travel Data Solutions LLC[9] | $34,600 |
| | | **Total** | **$231,020** |

*Id.*; Donelan Dec. ¶9.  Payments to Carnovale and others have been deducted from this total,

leaving a reasonable approximation of Bahadoorsingh's net profits from the sale of Momentous

shares.  Thus, Bahadoorsingh should be liable for disgorgement of $231,020 that he and his

---

[9] Travel Data Solutions was controlled by Bahadoorsingh and Carnovale.  *See* Compl. ¶32.

companies retained as their net profits from the Momentous scheme.

The Commission also seeks prejudgment interest.  "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." *Sargent*, 329 F.3d at 40 (internal citations omitted); *SEC v. Druffner*, 517 F. Supp. 2d 502, 512 (D. Mass. 2007) (the "First Circuit endorses the award of prejudgment interest in securities violations" because it prevents a defendant from receiving "what would otherwise be an interest-free loan").  The Court has broad discretion whether to grant prejudgment interest.  *Navellier*, 2021 WL 5072975, *8. When prejudgment interest is ordered "[in] SEC cases, courts typically calculate prejudgment interest using the rate established by the Internal Revenue Service for tax underpayment, which reasonably approximates the unjust benefit of a defendant's use of the money."  *Id.*; 17 C.F.R. §201.600(b) (Commission Rules of Practice compute prejudgment interest at IRS underpayment rate, compounded quarterly).  Prejudgment interest is calculated from the time of the defendants' unlawful gains to the entry of judgment.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996).

The Commission has computed prejudgment interest using the IRS underpayment rate, compounded quarterly, from the dates set forth in the Donelan Declaration at ¶¶10-12.  Using the methodology described therein, Bahadoorsingh should pay prejudgment interest of $20,814.  *Id.*

**E.  Bahadoorsingh Should Be Ordered to Pay a Third-Tier Civil Penalty.**

The Commission asks the Court to impose a third-tier penalty against Bahadoorsingh in the amount of $207,183.  Both the Exchange Act and the Securities Act allow the Commission to seek civil penalties against securities laws violators.  *See* 15 U.S.C. §77t(d)(1); §78u(d)(3)(A)  Under the civil penalty statutes, courts can impose penalties not to exceed the greater of:  (i) a defendant's gross pecuniary gain as a result of a violation, or (ii) a set amount per violation, depending on

whether the violation is a first, second or third tier offense.  15 U.S.C. §77t(d)(2); §78u(d)(3)(B).

As applied to Bahadoorsingh's violations, the maximum third-tier penalty amount for a natural

person that engaged in "fraud, deceit, manipulation or deliberate or reckless disregard of a

regulatory requirement," and the violation directly or indirectly results in substantial losses, or

creates a significant risk of substantial losses, to other persons, is $207,183 per violation.  *Id.*; 17

C.F.R. §201.1001(b)[10]

   The Commission submits that $207,183 is an appropriate penalty for Bahadoorsingh.  It is

roughly in line with his profits from his misconduct and is the amount of a single third-tier

penalty.[11]  Bahadoorsingh's violations directly or indirectly resulted in substantial losses or created

a significant risk of substantial losses to investors who decided to buy the Momentous stock that he

and Carnovale dumped into the market while they secretly promoted it.  *See* Compl. ¶48 (price and

volume chart for Momentous stock, showing precipitous price increase during promotion and quick

price decline thereafter); Donelan Decl. ¶¶15-16.

   A third-tier penalty also comports with the general factors courts consider when imposing

civil penalties:  (1) the seriousness of the violations, (2) defendant's scienter, (3) the repeated nature

of the violations, (4) whether the defendant admitted wrongdoing; (5) the losses or risk of losses to

other persons caused by the conduct; (6) defendant's lack of cooperation and honesty with

authorities; and (7) whether the penalty should be reduced due to a defendant's demonstrated

current and future financial condition.  *See, e.g., SEC v. Verdiramo*, No. 10-cv-1888, 2013 WL

---

[10] Though the statutes contain lower penalty amounts for each of the tiers, these amounts were increased for violations occurring after November 2, 2015, to account for inflation.  *See* 17 C.F.R. §201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of Jan. 15, 2022), *available at* www.sec.gov/enforce/civil-penalties-inflation-adjustments htm.  Under the three-tier penalty scheme, the maximum first-tier penalty for a person is $10,360 per violation, and the maximum second-tier penalty for a person that engaged in "fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement" is $103,591 per violation.

[11] Although the Commission is requesting imposition of a third-tier penalty, the amount the Commission seeks may be awarded as either a Tier-1 or Tier 2 penalty, as it does not exceed Bahadoorsingh's gross gain from his violations.  *See* 15 U.S.C. §77t(d)(2); §78u(d)(3)(B).

57823, *3 (S.D.N.Y. Jan. 7, 2013); *SEC v. Eagle Eye Asset Mgmt.*, 975 F. Supp. 2d 151, 162-63 (D. Mass 2013).

For reasons described above, factors one through five weigh in favor of a third-tier penalty. Regarding the sixth factor, Bahadoorsingh has not accepted responsibility for his violations of the law, has not cooperated with authorities to remedy the harm he helped to perpetuate, and has not participated in this case to subject himself to discovery.  Regarding the seventh factor Bahadoorsingh has refused to appear in this case or participate in discovery and disclose his assets. As a result, he should not benefit from any question regarding his ability to pay a penalty.

## **CONCLUSION**

For the reasons set forth above, the Commission respectfully requests that the Court enter the proposed default judgment against the Defendant in the form submitted herewith.


Dated: August 13, 2022                              Respectfully submitted,

                                                    SECURITIES AND EXCHANGE COMMISSION
                                                    By its attorney,

                                                    */s/ David J. D'Addio*
                                                    David J. D'Addio (BBO# 665790)
                                                    SECURITIES AND EXCHANGE COMMISSION
                                                    Boston Regional Office
                                                    33 Arch St., 24th Floor
                                                    Boston, MA 02110
                                                    (617) 573-8900 / DAddioD@sec.gov

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 13, 2022, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.  In addition, the Commission will serve a copy of the foregoing document by email on counsel for Bahadoorsingh.


<u>/s/ David J. D'Addio</u>
David J. D'Addio